**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

**RICHARD A. CLARK,**

**Plaintiff,**

**v.** **Case No. 2:07-CV-201-FtM-DNF**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**
______________________________________/

**OPINION AND ORDER**[1]

The Plaintiff filed an application for a period of disability and disability insurance benefits, on December 6, 2004, alleging disability beginning November 25, 2001. The claim was denied initially and upon reconsideration. On July 13, 2006, a hearing was held before Administrative Law Judge Karl Alexander at Morgantown, West Virginia. [Tr. 386]. On September 12, 2006, Administrative Law Judge Alexander issued his decision denying the Plaintiff's application. [Tr. 14-25] The Appeals Council denied the Plaintiff's Request for Review on February 2, 2007, [Tr. 6-8] making the ALJ's decision the final decision of the Commissioner. For the reasons set out herein, the decision is **AFFIRMED**.

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda.

---

[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated December 21, 2007. (Doc.# 12).

## I. SOCIAL SECURITY ACT ELIGIBILITY, THE ALJ DECISION AND STANDARD OF REVIEW.

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511. The plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On December 6, 2004, the Plaintiff filed his application for Disability Insurance Benefits alleging disability beginning November 25, 2001. The Decision of ALJ Alexander dated September 12, 2006, denied the Plaintiff's claim for benefits. (Tr. 14-25). At Step 1, the ALJ found the Plaintiff has not engaged in substantial gainful activity since his alleged onset date of November 25, 2001. (Tr. 18). At Step 2, the ALJ found that the Plaintiff has had the following severe physical impairments: degenerative disc disease/ degenerative arthritis of the thoracic/lumbar and lumbosacral spine, status post surgeries with subsequent lumbar strain; status post coronary artery bypass graft surgery, resection ("CABG") surgery, resection of aortic aneurism and replacement of aortic aneurism and replacement of aortic valve, obesity; diabetic peripheral neuropathy; history of lower extremity edema; and chronic obstructive pulmonary disease ("COPD"). At Step 3, the ALJ found that during the period in question, the Plaintiff did not have an impairment or combination of impairments which met the criteria of any of the listed impairments described in Appendix 1, Subpart P, Regulation No. 4. At Step 4, the ALJ

determined Plaintiff was not able to perform his past relevant work as an equipment operator. The ALJ found that the Plaintiff retained the residual functional capacity (RFC) to perform a reduced range of light work. [Tr. 18]. The ALJ, along with the VE testimony found the Plaintiff could perform a significant number of jobs that exist in the national economy. [Tr. 24]. Accordingly, the ALJ found the Plaintiff not disabled at step five of the sequential evaluation. 20 C.F.R. §§416.920(a)(4) and (g).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Walden v. Schweiker*, 672 F.2d 835, 838-9 (11th Cir. 1982).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. REVIEW OF FACTS

The Plaintiff was born on September 21, 1957 and was forty-eight (48) years old at the time of the Administrative Hearing. [Tr. 388]. The Plaintiff has an 11th grade education and worked as a heavy equipment operator[2]. [Tr. 390]. The Plaintiff alleged in his application for benefits that he became unable to work on November 25, 2001 due to a back injury and open heart surgery. [Tr. 70].[3]

On December 17, 2001, the Plaintiff was seen by Frank Pap, M.D. for an MRI of his lumbar spine because of his low back pain. "IMPRESSION: 1. There are spur/bulge complexes from T-11 through L-5. No disc herniations are seen. Marked flattening of the thecal sac is identified from L-1 through L-5. The foramina are narrowed bilaterally from L-2 through L-5". [Tr. 166].

On January 28, 2002, the Plaintiff was seen by Dr. E. Richard Prostko. Dr. Prostko evaluated the Plaintiff's myelogram and CT scan which were done on 1/11/02. The study revealed marked congenital stenosis from T-11 through S-1. The Plaintiff's stenosis seemed to be most severe at the L1-2 level. Dr. Prostko was concerned the Plaintiff "may have some arterial compromise in the lower extremities as well." [Tr. 142]. It was recommended that the

---

2 The vocational expert who testified at the hearing identified heavy equipment operator as an "asphalt paving machine operator", which is a medium and skilled job according to the Dictionary of Occupational Titles, 1991 WL 681929, No. 853,.663-010 (4th ed. Revised 1991) (DOT] [Tr. 406].

3 The Plaintiff returned to work on April 2003 but re-injured his back and stopped working in August 2003. The ALJ found this to be an unsuccessful work attempt. The ALJ also found the Plaintiff had another unsuccessful work attempt: July 2002 (when he returned to work as an equipment operator) until November 2002 (when he was laid off because it was seasonal work. [Tr. 391-392].

Plaintiff be seen by a urologist in order to evaluate him for his bladder dysfunction and impotence; to schedule bilateral lower extremity arterial Dopplers testing; and the medication Lodine was replaced by Celebrex. [Tr. 142].

On April 3, 2002, the Plaintiff underwent surgery from the T-11-S-1 , laminectomy and bilateral multilevel foraminotomies due to lumbar stenosis from L2 through the sacrum. The surgery went well post operatively, except for some post-op fever. The Plaintiff was started on physical therapy and occupational therapy. The Plaintiff was released on April 12, 2002. [Tr. 132].

The Plaintiff was seen for follow-up on August 14, 2002, by Dr. Prostko. The Plaintiff was "getting along reasonably well with good relief of his prior lower extremity radicular pain syndrome." The Plaintiff advised that he was working for a different company and running a roller machine. [Tr. 133].

On November 26, 2002, the Plaintiff was seen by Michael J. Platto, M.D., of the Spine Institute of Southwestern Pennsylvania. The Plaintiff reported that he had returned to work full-time at the end of July 2002. About six weeks ago, with the onset of colder weather, the Plaintiff states his back pain and left leg pain returned. The Plaintiff complained of pain in the mid lower back, left buttock, left posterior thigh and calf to the foot. The Plaintiff also reported that his pain was at a 4-5 on a scale of 0 to 10. Dr. Prostko recommended an MRI with gadolinium contrast; to have EMG and nerve conduction studies of both lower extremities; check his functional capacity evaluation; SMS testing; and to consider high level physical therapy exercise program. The Plaintiff was encouraged to continue working full-time. The Plaintiff was placed on Tolectin, Naprosyn and Ultracet. Narcotic medicine was

not recommended due to the Plaintiff running heavy equipment. The Plaintiff was given a prescription for an industrial back brace and was return to the office for his EMG. [Tr. 144-145].

On December 5, 2002, an MRI of the Plaintiff's spine (with and without contrast) revealed: "IMPRESSION: There are findings representing decompressive post surgical changes from L1 through L5. No Spinal Stenosis is present on the current exam. There are areas of enhancing scarring posteriorly. No disc herniation is identified". [Tr. 165].

On December 18, 2002, the Plaintiff was referred for a functional capacity evaluation and was referred to Health South for assessment of his physical and functional capabilities. Functional testing revealed that the Plaintiff is presently lifting in the light category of work. The Plaintiff deferred lift testing due to increased tightness in his lower back. The Plaintiff was able to do repetitive reaching and simple grasping on a constant basis, sitting, standing, walking, repetitive bending (stooping), forward reaching, repetitive squatting, push/pulling and firm grasping on a frequent basis and stair climbing, static bending, overhead reaching, crawling, kneeling, ladder climbing and pivot twisting on an occasional basis. [Tr. 158, 159].

On January 27, 2004, an MRI of the Plaintiff's spine (with and without contrast) revealed: "IMPRESSION: Moderately Advanced Degenerative arthritis of the lumbar spine with marginal osteophytes as well as multi-level disc disease from L1-2 down to L5-S1. Central bulging discs are noted. No disc herniation or lumbar spinal canal stenosis was noted". [Tr. 164].

On February 3, 2004, the Plaintiff was seen at Eagle Physical Therapy by therapist,

Frank Kula, MPT, ATC, at the request of Dr. Platto. The Plaintiff reported he aggravated his condition (low back pain) while painting marks on a road. The Plaintiff's reported symptoms include low back pain, bilateral hip pain and bilateral lower extremity radicular symptoms. Functional limitations include lifting, pushing, pulling, bending forward, twisting or rotating, squatting, kneeling or getting up off of the floor. The Plaintiff is presently on Ultraset. This FCE is to determine the patient's ability to function at his work duties as well as to determine his ability to participate in a formal work conditioning program. [Tr. 170]

After this assessment was made it was determined that the Plaintiff was a candidate for a comprehensive work conditioning program 3 times a week for 6-8 weeks. "Once the formal work conditioning program is completed, the patient will again be given a FCE to determine his functional capacity and determine if he is able to safely return to his previous job without limitation". [Tr. 173].

On March 4, 2004, the Plaintiff was seen for the last time for physical therapy following 14 formal work conditioning sessions. The Plaintiff was found to have improved from lifting "13 pounds floor to knuckle to 23 pounds floor to knuckle". The Plaintiff's aerobic endurance was still found to be poor. At this time the Plaintiff had not returned to work and had a pain score of 7-8 out of 10. Frank Kulla, Facility Director of Eagle Physical Therapy advised on the Plaintiff's Discharge Summary the following: "Patient has not achieved all preset goals secondary to plateau in rehabilitation potential at this time. The patient is discharged from formal work conditioning program at this time. He is discharged to HEP and has been given written instructions". [Tr. 167].

On June 3, 2004, the Plaintiff received a left and right heart catheterization, a selective coronary angiography, left ventricular angiography and aortic angiography. These tests revealed a "totally occluded dominant RCA; mild disease of the left coronary system; preserved over-all LV systolic function; dilated ascending aorta and moderate aortic stenosis and mild aortic regurgitation. [Tr. 199] On June 4, 2004, the Plaintiff had open heart surgery because of hypertension, hyperlipidemia, non insulin-dependent diabetes mellitus and chronic obstructive pulmonary disease. [Tt. 221]. On December 20, 2004, the Plaintiff was examined by Dr. Saradar. The Plaintiff was "feeling well, weight 267 lbs., lungs clear, heart regular, 72 beats per minute, no murmur". Plaintiff showed significant improvement. [Tr. 325].

On April 11, 2005, the Plaintiff was referred for a second functional capacity evaluation and was evaluated by Dilip S. Kai. It is documented in the RFC evaluation that the Plaintiff drives a car and goes shopping. He can climb eight steps one to two times a day. He can lift up to 20 lbs. Neurontin and Altrecet work for his pain up to six hours. The Plaintiff was found to be partially credible regarding his limitations. Postural limitations were "occasionally for all because of back surgery". There were no limitations on visual or manipulative. [Tr. 324, 325]

On June 23, 2006, the Plaintiff was seen by Rory Tropp, M.D., for a follow-up appointment from his surgery. An EKG was done which showed normal sinus rhythm. The Plaintiff's chest x-ray was clear and his lab work was normal. The Plaintiff was advised to be up and about walking. [Tr. 220-222]. " IMPRESSION: Weakness status post recent surgery",

On July 27, 2004, the Plaintiff returned to Cardiology Associates and was seen by Dr. Raef Hajj-Ali, M.D. The Plaintiff was advised of risk factors in the event he doesn't change his life style. The doctor advised the Plaintiff of the risk factors and the aggressive modifications he would need to make, to-wit: "weight loss, healthy eating habits and regular exercise" The Plaintiff advised the doctor that he had just bought a treadmill to work out at home and was going to join Weight Watchers. [Tr. 232-233]

**III. SPECIFIC ISSUES AND CONCLUSIONS OF LAW:**

**A. THE ALJ'S RFC IS INCOMPLETE AND DOES NOT COMPLY WITH SSR 96-9P, WHICH RESULTED IN INCOMPLETE HYPOTHETICALS PRESENTED TO THE VOCATIONAL EXPERT**

The ALJ's decision states that the Plaintiff's RFC is limited to a "sit/stand option" due to the Plaintiff's obesity, neuropathy and edema. [Tr. 23]. In the instant case two functional capacity evaluations were performed. On December 19, 2002 [Tr. 162], the Plaintiff was able to sit for 51 minutes, stand for 40 minutes and walk .38 of a mile in 12 minutes. Dr. Michael Platto of the Spine Institute of Southwestern Pennsylvania" started treating the Plaintiff following back surgery in 2002. [Tr. 260]. Summary of physical capability written on 9/17/2004 by Dr. Platto's office: " lifting 20 pounds occasionally, l0 pounds frequently and permissible is light which is consistent with MER as far as back surgery is concerned. )This is also in the dictation of 11/14/2004)." "However, combining the cardiac allegation claimant's total physical capacity is full range of sedentary." [Tr. 324].

On April 11, 2006, the Plaintiff was able to lift 20 pounds occasionally, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, and had unlimited push and/or pull abilities. [Tr. 316, 325]. Following the Plaintiff's cardiac surgery, Dr. Saradar reported significant improvement with respect to Plaintiff's edema from Lasix on July 26, 2004. [Tr. 334]

The record shows that Dr. Platto advised the Plaintiff not to file a claim for Social Security disability. On April 2, 2004, Dr. Platto stated "[d]iscouraged patient from applying for SSDI. I did tell him I thought he was capable of lifting 20 pounds on an occasional basis, told him I thought he was too young to go on long-term disability. Would like to get him at least back to some kind of modified duty work". [Tr. 247].

On April 26, 2005, following a bout of edema, Dr. Saradar reported the Plaintiff responded to medication and the "leg edema nearly subsided". [Tr. 327].

On August 1, 2005, Dr. Platto stated "again discourage patient from applying for SSDI. He does appear to be capable of lifting 20 lbs on an occasional basis, however the patient does not feel he is capable of working at all". [Tr. 352]. Dr. Platto restated this opinion on November 1, 2005, and November 29, 2005. [Tr. 349, 351].

. In March 2006, the Plaintiff vacationed in Florida and Dr. Janet Tobin treated Plaintiff for chronic lymphedema and noted the use of a pump would provide relief. [Tr. 356-357]. On May 8, 2006, Dr. Platto indicated the Plaintiff had no edema in his legs, the peripheral neuropathy was better with medication (Lyrica), and his pain level had improved. [Tr. 359]. On May 26, 2006, Dr. Saradar stated the Plaintiff's left leg had improved significantly with pump treatment. [Tr. 365].

**B. THE ALJ ERRED WHEN HE FAILED TO PROPERLY ASSESS THE CLAIMANTS SPECIFIC FUNCTIONAL CAPACITY TO HANDLE STRESS, THEREBY RENDERING THE HYPOTHETICAL TO THE VE INCOMPLETE**

The Plaintiff argues that the ALJ did not include the limitation of stress in his hypothetical to the ALJ. However, the ALJ limited the Plaintiff to "work in a low-stress environment with no production line type of pace or independent decision-making responsibilities". [Tr. 408].

**C. THE ALJ FAILED TO PROPERLY ASSESS OTHER FUNCTIONAL LIMITATIONS WHEN DEVELOPING THE RFC, RENDERING THE HYPOTHETICALS TO THE VE INCOMPLETE**

The Plaintiff argues that the ALJ failed to account for an array of problems such as his difficulties with mathematics in his hypothetical to the ALJ. The Plaintiff refers to the DOT general educational development (GED) math criteria for the jobs the vocational expert identified that the Plaintiff could perform, which the Plaintiff alleges exceeds his abilities. The ALJ had questioned the Plaintiff regarding his general ability to do simple math and the Plaintiff had responded in the affirmative.[4] [Tr. 390].

The Plaintiff argues the ALJ did not properly factor in the Plaintiff's need to use his lymphadema compression pump for one hour a day because he assumed the Plaintiff could use it after work or during lunch. [Tr. 19]. The Plaintiff contends the ALJ should have asked the

4 The DOT specifies that the Plaintiff's past relevant work as an Asphalt Paving Machine Operator requires the same math abilities as the jobs the VE found within the Plaintiff's RFC. DOT, 1991 wl 681929, No. 853.663-010.

Plaintiff if he had to use the pump at any particular time of day. The ALJ did question if the Plaintiff needed the pump at all given that the Lasix and other diuretics the Plaintiff was taking had provided good results according to Dr. Saradar. [Tr. 19, 327].

The Plaintiff argues the ALJ did not take into consideration his need to take frequent bathroom breaks due to his bladder condition. However, the ALJ did address the Plaintiff's testimony that he needed to take a bathroom break every 15 minutes to urinate. [Tr. 19[5], 396]. The ALJ was unable to find where the Plaintiff had told his medical sources he needed such frequent bathroom breaks. The vocational expert testified that taking a bathroom break every half hour would not impact on the jobs the Plaintiff could otherwise do. [Tr. 407-08]

The Plaintiff argues that the Plaintiff failed to include fatigue among his functional limitations. The ALJ addressed the Plaintiff's fatigue at the hearing and asked what he did to relieve this particular symptom. [Tr. 396]. The Plaintiff replied, "[t]ake a nap sometimes in the middle of the day". The ALJ followed up and asked "Every day?, the Plaintiff responded with "Just about." The medical evidence of record fails to show any of the Plaintiff's physicians prescribing naps, nor does it show that the Plaintiff consistently complained of fatigue to his doctors.

In May of 1996, the Plaintiff advised Dr. Platto that he took aerobics three times per week while he was visiting Florida and felt better there. [Tr. 359]. The Plaintiff returned to work in April 2003 until he re-injured his back in August of 2003. [Tr. 61]. In July of 2004, the Plaintiff reported that following his cardiac surgery he was feeling much better "with

---

[5] On May 9, 2006, the Plaintiff denied polyuria (the passing of large amounts of urine). [Tr. 364].

significant improvement in his breathing and energy level" and his chief complaint on that particular visit was erectile dysfunction for which he had taken Viagra. [Tr. 232]. In August of 2004 the Plaintiff was doing well and in October 2004 the Plaintiff reporting he was feeling very well[6].

**D. THE CLAIMANT'S ABNORMAL STRESS TOLERANCE LEVEL DUE TO HIS CARDIAC AND OBESITY CONDITIONS IS A "SEVEREL MENTAL IMPAIRMENT DUE TO A GENERAL MEDICAL CONDITION AND REQUIRES AN ASSESSMENT OF WHETHER CLAIMANT MEETS OR EQUALS ONE OF THE LISTING OF IMPAIRMENTS AS WELL AS DEVELOPMENT OF THE MENTAL RFC**

The Plaintiff argues that he has a severe mental impairment because he has tolerance for only low stress jobs. The ALJ limited the Plaintiff to work in a low stress environment due to his heart condition and obesity , not due to a mental impairment. [Tr. 21]. There is no evidence in the medical record that the Plaintiff was diagnosed with a mental impairment. Further there is no suggestion by a medical source that the Plaintiff's cardiac and obesity conditions caused a mental impairment. The low stress limitation is a limitation due to the Plaintiff's physical condition. Social Security Ruling 02-1p provides guidance on the evaluation of disability claims involving obesity.

The ALJ recognized SSR 20-1p at 57863 and considered the effect of Plaintiff's obesity when evaluating his other impairments. The ALJ was not required to provide the analysis required under 20 C.F.R. §404.1520a.

---

6 Activities are a factor for consideration. *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir.; 20 C.F.R. §404.1529; 96-7p. (adjudicators should consider an individual's daily activities in assessing credibility of his or her statements about pain and other symptoms and about the effect the symptoms have on the ability to function).

**E. THE VOCATIONAL TESTIMONY WAS DEFICIENT, NOT CREDIBLE, NOT RELIABLE, AND SHOWED NUMEROUS CONFLICTS WITH THE DOT**

The Plaintiff argues that the ALJ proffered a deficient hypothetical to the vocational expert[7] because the hypothetical specified a sit/stand option, but did not describe the frequency of the Plaintiff's need to alternate sitting and standing. The ALJ implicitly indicated the frequency the Plaintiff would have to alternate sitting and standing by imposing no particular limitation. The ALJ's hypothetical encompassed the ability to perform light or sedentary work with a sit/stand option and the VE testified jobs were available at both levels of exertion.

The ALJ even acknowledged he included a sit/stand limitation, "giving the Plaintiff the maximum benefit of the doubt regarding his subjective complaints even though he is not entirely credible" with respect to his obesity, neuropathy and edema. [Tr. 23]. It could be determined that the Plaintiff did not even need a sit'/stand limitation because according to the Plaintiff's treating physicians, the Plaintiff's leg edema and neuropathy were under control. [Tr. 18]. [8]

The ALJ determined that the Plaintiff's limitations included a sit/stand option; walking on even level surfaces, performing postural movements occasionally, except he could not climb ladders, ropes or scaffolds no exposure to temperature extremes, environmental pollutants, or

---

[7] The ALJ's reliance on VE testimony was proper if the hypothetical posed to the expert adequately protrayed his impairments and limitations and the expert identified a significant number of jobs compatible with the limitations and capacities set forth in the hypothetical. *McSwain v. Bowen*, 814 F.2d 617, 620 (11th Cir. 1987); *Pendley v. Heckler*, 767 G.2d 1561, 1563 (11th Cir. 1985).

[8] The Commissioner considers the following factors in deciding the weight to be given to any medical opinion: examining relationship, treatment relationship, support ability, consistency, specialization, and any other factors which tend to support or contradict the opinion. 20 C.F.R. §404.1527(d).

hazards; and working in a low stress environment with no production line type of pace or independent decision making responsibilities. The Plaintiff could not perform his past relevant work. Using the vocational expert's testimony, along with the Medical-Vocational Guidelines as a framework, the ALJ found that the Plaintiff could perform a significant number of jobs existing in the national economy. 20 C.F.R. pt. 404, subpt. P, app.2, rule 202.18. The ALJ found Plaintiff not disabled at step five of the sequential evaluation. 20 C.F.R. § 404.1520(g).

## IV. CONCLUSION

For the foregoing reasons, the ALJ's decision is consistent with the requirements of law and supported by substantial evidence. Judgment should be entered pursuant to sentence four of 42 U.S.C. §405(g) **AFFIRMING** the decision of the Commissioner.

**DONE and ORDERED** in Chambers at Ft. Myers, Florida, this 30th day of September 2008.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record